STATE

v.

Albert Edward SITKO.

No. 81–74–C.A.

Supreme Court of Rhode Island.

May 2, 1983.

Dennis J. Roberts II, Atty. Gen., Anthony DelBonis, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

SHEA, Justice.

The defendant, Albert Edward Sitko, appeals his conviction of two counts of possession of a firearm after a previous conviction of a crime of violence. At trial, much of the evidence presented against the defendant resulted from a search authorized by a warrant. This warrant, in turn, was based on evidence supplied by the results of a court-authorized wiretap placed on the telephone in the Woonsocket home of defendant Sitko. Prior to trial, the defendant filed a motion to suppress the evidence obtained from the wiretap, which was denied. We reverse.

On July 26, 1978, then-Attorney General Julius C. Michaelson, pursuant to G.L.1956 (1969 Reenactment) chapter 5.1 of title 12, made application, in writing, to the Presiding Justice of the Superior Court for an order authorizing the police to place a wiretap on a phone, 765–1861, listed under the name of Patience Sitko, the defendant's wife. In his sworn application, the Attorney General asserted that information presented to him by members of the Intelligence Unit of the Rhode Island State Police led him to believe that defendant and others were committing several named violations of the General Laws of Rhode Island [1]

1. The application listed a number of offenses including: robbery, assault with a dangerous

and suggested that defendant was using 765–1861 to further these and other illicit activities.

Attached to the application was an affidavit by Brian R. Andrews, a member of the Rhode Island State Police's Organized Crime Intelligence Unit, detailing information regarding defendant's activities. The affidavit first stated that Officer Andrews, in light of an informant's statements, had investigated defendant, and then outlined the nature and results of his surveillance of Sitko during the spring of 1978.

The authorization order permitting the installation of a wiretap on 765–1861 was entered on July 27, 1978. It contained a finding that there was probable cause to believe that defendant was committing a number of offenses and that information concerning the stated offenses "as more fully detailed on Page 3 of the Application of Attorney General Julius Michaelson" would be obtained through interception of wire communications over telephone 765–1861. The order permitted the police to tap the telephone for a thirty-day period, twenty-four hours daily. Furthermore, it provided that although the order to intercept "shall not automatically terminate when the above-described communications have been first obtained", it must terminate "upon attainment of the authorized objective or in any event within thirty (30) days * * *."

As a result of the conversations overheard, the police applied to the presiding justice for a search warrant for the premises located at 61 Wilson Avenue, the home of defendant and his wife. A warrant was issued authorizing the police to search for "any firearm." In September 1978 the police executed the warrant and, in the course of the search, discovered and seized two firearms that, along with other items seized, were introduced at defendant's trial. Prior to trial, defendant unsuccessfully moved to suppress the results of the wiretap as well as those of the search.

Before us now, defendant asserts numerous errors of law arising both before and during trial, including the hearing justice's refusal to suppress the product of the wiretap on the phone located in defendant's home. In particular, defendant contends that the wiretap order did not contain a particular description of the type of communication sought to be intercepted, as required by our state's wiretap statute, G.L. 1956 (1981 Reenactment) § 12–5.1–5. We agree.

Electronic devices enable law enforcement officers to monitor and record the private conversations of individuals and therefore allow them to monitor the movements of persons and objects. We have recognized that wiretapping is undoubtedly a "valuable tool in a police officer's arsenal as he wages war with the criminal element in our society." *State v. Maloof,* 114 R.I. 380, 383, 333 A.2d 676, 678 (1975). Uncontrolled use of such devices, however, threatens the privacy of individuals. In fact, "tapping," because of its continuous nature, poses a much greater threat to one's right of privacy than a conventional physical search of one's premises.

This court has stated that the citizens of this state have "a double barrelled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions: the fourth amendment of the Federal Constitution and the Declaration of Rights which is specified in the Rhode Island Constitution." *State v. Luther,* 116 R.I. 28, 29, 351 A.2d 594, 594–95 (1976); *State v. Maloof,* 114 R.I. at 384, 333 A.2d at 678. Both documents provide for the right of the people to be secure in their persons, papers, and possessions against unreasonable searches and seizures. Our previous decisions also recognized that under the guarantees of our Rhode Island Constitution, we could establish a higher standard of protection for this state's citizens than

weapon, possession of concealable weapons, carrying arms when committing crimes of violence, larceny, receiving stolen goods, conspir-

acy to violate said sections of the General Laws of Rhode Island.

might otherwise be afforded under the Fourth Amendment. *State v. Maloof,* 114 R.I. at 389, 333 A.2d at 681. This court therefore adopted a higher standard of protection by requiring that there be strict compliance with the explicit directives detailed in § 12–5.1–5, which specifies the form and content that must be satisfied to conduct an electronic search. *State v. Luther,* 116 R.I. at 29, 351 A.2d at 595.

Chapter 5.1 of title 12, which became effective on May 2, 1969, was adopted in response to Title III of the Omnibus Crime Control and Safe Streets Act enacted by Congress in 1968 and codified as 18 U.S.C.A. §§ 2510 to 2520 (1970). *State v. Maloof,* 114 R.I. at 381, 333 A.2d at 677. Our statute, which is very similar to the federal counterpart, authorizes the Attorney General or an assistant attorney general to apply to the Presiding Justice of the Superior Court for an order authorizing the electronic interception of "any wire or oral communications" by certain federal, state, or municipal law enforcement officers as they conduct an investigation of several specific crimes. *Id.* Section 12–5.1–5 dictates the form and contents of such orders. In its relevant portions, section 12–5.1–5(a) states:

> "Each order authorizing the interception of any wire or oral communication shall specify—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (3) a particular description of the type of communications sought to be intercepted, and a statement of the particular offense to which it relates; \* \* \*."

In the case at bar, the order of July 27, 1978, did not contain a particular description enumerating the type of ·communications sought to be intercepted. Rather, the order incorporates by reference page 3 of the Attorney General's application to gain that information.[2]

The state maintains that it is constitutionally permissible to look to the application to fulfill the particular requirements of the order, evidently relying, as did the hearing justice, on *United States v. Tortorello,* 480 F.2d 764, 780 (2nd Cir.1973). In *Tortorello,* the court said that when the hearing judge decides whether the order or application is sufficiently particular, the papers as a whole must be considered. As long as the descriptions of the communications to be intercepted are sufficiently particular in the affidavit, it is permissible for a judge to incorporate the affidavits into the orders. *Id.* at 781.

As we have stated, we are concerned in these cases with ensuring that statutorily authorized electronic surveillance would take place "only when the individual, subject to this secretive form of search and seizure, is afforded a full measure of protection." *State v. Luther,* 116 R.I. at 29–30, 351 A.2d at 595. Federal decisions interpreting Title III have often suggested that substantial compliance with the legislation is all that is required to meet Fourth Amendment standards. However, mindful of our "paramount obligation" under our Rhode Island Constitution to preserve these rights, this court has insisted that there be strict compliance with the explicit directives enumerated in our state legislation, § 12–5.1–5, ensuring that an individual's privacy receives the full measure of protection. *State v. Luther,* 116 R.I. 28, 351 A.2d 594 (1976); *State v. Maloof,* 114 R.I. 380, 333 A.2d 676 (1975). We see no reason at this time to depart from these high standards. We hold today that in this case, and in the case of all orders entered after the date of this opinion, such orders must contain within the four corners of the document a particular description of the type of communications to be intercepted.

---

**2.** The order stated:

"(3) The particular description of the type of communications sought to be intercepted are wire communications over, by or through the use of the above-described telephone facility, numbered 765–1861 for the purpose of committing the above-designated offenses *as more fully detailed on Page 3* of the application of Attorney General Julius C. Michaelson." (Emphasis added.)

Our interpretation of the statute today involves more than a question of form over substance. Rather, we acknowledge that under this statutory scheme it is the order and not the application that authorizes the wiretap. When conducting a search through electronic surveillance, the order is the functional equivalent of the warrant in a conventional search. It is the document that sanctions, and more importantly, places the limits on, police activity. *See generally State v. Maloof,* 114 R.I. at 389, 333 A.2d at 681.[3]

This requirement for a particular description of the communications sought therefore plays an important role in the regulation of law enforcement. It is the formula by which our state statute attempts to satisfy the Fourth Amendment's requirement that a search warrant particularly describe the "thing to be seized." The need for particularity in describing this limit in the case of eavesdropping is especially great, since by its very nature eavesdropping involves an intrusion on privacy that is broad in scope. This requirement in the statute is therefore often the yardstick by which a court determines whether other directives in the wiretap statute have met with compliance. For example, § 12–5.1–5(b) requires an electronic search to terminate when the authorized objective of the surveillance is obtained. Our legislation, like the federal equivalent, does not mandate that the order explicitly recite its authorized objective.[4] Insomuch as an authorized objective is generally understood to mean the gathering of evidence to convict the parties of the various crimes of which they may be charged, more often than not, a reviewing court must look to the description of the particular type of conversations to be intercepted to evaluate whether this duration directive has been violated.[5] Precise descriptions of the communications to be overheard is thus an essential element of an order if the surveillance is not to be unreasonably protracted.

Additionally, the relationship between this requirement for particularity of description of conversations to be monitored and the minimization requirement articulated in the legislation[6] further substantiates the need to describe the intercepted conversations precisely in the order. If the order is imprecise or lacks this information, far more conversations can be overheard without violating the minimization requirement, thereby reducing it to a nullity.

Recitation of these particular communications in the order facilitates a reviewing court's ability to ensure that the directives of the statute are met. Rather than looking to a series of documents to review compliance, inclusion of these specifics within

---

3. Even the court in *Tortorello* apparently recognized that the order is the controlling document for they indicate that "[i]t would have been better if he [the judge] had stated in the orders themselves more precisely what those authorized to execute the orders were entitled to overhear and record. * * * The judge in effect fully approved the scope and purpose of the surveillance as delineated in the application papers." *United States v. Tortorello,* 480 F.2d 764, 781 (2nd Cir.1973).

4. Although our legislation does not require an explicit recitation of the objective in the order, it undoubtedly plays an important role in the regulatory function of the statute. *See State v. Maloof,* 114 R.I. 380, 333 A.2d 676 (1975). Additionally, evidently to avoid constitutionally impermissible granting of discretion to police, two jurisdictions require a statement in the application of how the surveillance evidence will be material or aid in apprehending the subject. *See* Conn.Gen.Stat.Ann. § 54–41c(5)(F) (West Supp.1982); Mass.Gen.Laws Ann. ch. 272, § 99(F)(2)(b) (West 1970).

5. *See, e.g., United States v. Cohen,* 530 F.2d 43, 45 (5th Cir.1976); *United States v. Steinberg,* 525 F.2d 1126, 1132 (2nd Cir.1975).

6. The minimization requirement is found at G.L.1956 (1981 Reenactment) § 12–5.1–5(b) and in relevant part states:

"Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, *shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter,* and must terminate upon attainment of the authorized objective, or in any event in thirty (30) days." (Emphasis added.)

the order provide police, as well as the court, with definite guidelines to regulate surveillance. The more details a court requires in the order, the less chance there is that the court-authorized eavesdropping will become an excessive, general and exploratory search of a person's conversational privacy.

Even if we were to apply the incorporation approach that is contained in *Tortorello,* as the state advocates, the description of the communications contained on page 3 of the Attorney's General's application is unlikely to meet the standard of sufficient particularity to pass constitutional muster. As referred to earlier, § 12–5.1–5(a)(3) of our state statute, like its federal counterpart, requires "a *particular* description of the type of communications sought to be intercepted, and a statement of the particular offense to which it relates." (Emphasis added.) The federal decisions in this area demonstrate that a pragmatic approach has been taken with respect to the particularity requirement. *See, e.g., United States v. Tortorello,* 480 F.2d at 780. This directive does not require that the actual content of the conversations be stated, for it would be impossible to predict the contents of a conversation that has not yet taken place accurately. What it directs is that a specific crime or a specific series of related crimes must be identified. *Id.*

An examination of the description recited in the Attorney General's application and referenced in the wiretap order in this case, reveals that it is hopelessly overbroad. The application first indicates that the communications sought to be intercepted are wiretap communications over the telephone facility numbered 765–1861. It then goes on to suggest the facility will receive communications involving a panoply of offenses including "breaking and entering of business establishments," "arm robberies involving the use of guns and firearms," and

"receiving stolen goods," to name just a few. Finally in subparagraph (e) the application states:

"To transmit to or to receive from persons communications resulting in agreements, contrivances, confederations, *conspiracies to do unlawful acts in violation of the General Laws of the State of Rhode Island,* and more particularly conspiracies to violate those offenses above described." (Emphasis added.)

This description, at least the second half of it, is not a "particularized one" and theoretically expands the type of communications sought, to include virtually every offense on the statute books of Rhode Island, many of which are not designated in § 12–5.1–1(g).[7]

The state acknowledges that this court insists upon a standard of strict compliance with the requirements of the statute. Nevertheless, relying on *United States v. Moore,* 513 F.2d 485, 502–03 (D.C.Cir.1975), the state argues that we should analyze the description of the application, and therefore the description of the order, in a "common-sense" fashion. The state contends that such an analysis makes inescapable the conclusion that the state, and therefore the justice below, in fact strictly complied with the statute. We must disagree. Our review of the federal decisions, where a lesser standard of compliance is applied, discloses no instance in which broad language such as that found in this application has passed constitutional muster. *See, e.g., United States v. Licavoli,* 604 F.2d 613, 620 (9th Cir.1979) (communications pertaining to receiving, concealing, selling, or disposing of goods of the value of $5,000 or more knowing the same to be stolen); *United States v. Cohen,* 530 F.2d 43, 45 (5th Cir.1976) (conversations related to trafficking in narcotics); *United States v. Turner,* 528 F.2d 143, 154 (9th Cir.1975) (communications involving the date, time, place, manner in which

7. This portion of the legislation authorizes the use of electronic surveillance in the investigation of several specified crimes including murder, robbery, kidnapping, as well as certain gambling or drug offenses that are punishable by imprisonment for a period of more than a year.

illegal narcotic drugs will be delivered); *United States v. Steinberg,* 525 F.2d 1126, 1131 (2nd Cir.1975) (communications which reveal scheme to distribute narcotics); *United States v. Mainello,* 345 F.Supp. 863, 872 (E.D.N.Y.1972) (communications concerning offenses enumerated in Title 18, U.S.C.A. which have been committed (gambling) ).

Where incorporation in the order of the application papers is allowed, the judge in effect fully approves the scope and purpose of the surveillance as delineated in the application papers. *United States v. Tortorello,* 480 F.2d at 781. Therefore, sufficient particularity in an application's description is necessary if the police are to be precluded from impermissibly exercising their own discretion in seizing anything they happen to think offensive, a practice that directly contravenes the mandate of the Fourth Amendment. *See United States v. Turner,* 528 F.2d at 154.

Finally, the state seems to suggest that the inclusion of this overbroad description might have been inadvertent, for in its brief, the state extended their "sincerest apologies to the appellant for its inability to turn a phrase with the accuracy of a William Shakespeare." However, even if inclusion of this language was an oversight, we can sanction neither the poetic license of a zealous prosecutor nor a good-faith defense for failure to comply with this provision, which is an integral component of the statutory scheme for court-authorized surveillance.[8] To do so would possibly allow the very abuses this legislation sought to remedy. As indicated in *Maloof,* although we are dealing with court-authorized orders, we must be realistic and recognize that the execution of an order is properly the function of the police who are not familiar with the many explicit conditions and circumstances that are detailed in § 12–5.1–5. Here, the description of the communications contained in the application and incorporated into the order impermissibly included those communications resulting in "agreements, contrivances, confederations, conspiracies to do unlawful acts in violation of the General Laws of the State of Rhode Island." We have stated:

> "[W]e do not expect a police officer in the execution of a search warrant to act with the precision of a surgeon as he wields a scapel, neither can we expect that the police be conversant with the many precise commands delineated in the wiretap act. That is the primary responsibility of the professionals who draw up the application and the order, the Attorney General's Department." *State v. Maloof,* 114 R.I. at 389–90, 333 A.2d at 681.

Today, this court again holds that the people of this state are entitled to a higher standard of protection when we insist on strict compliance with our wiretap statute. As a practical matter, we realize that the presiding justice is often presented with the application, supporting papers, and draft of the order with little time to review these weighty documents, and realistically must rely to some extent on the expertise of the Attorney General's department to prepare the papers adequately. Therefore, we reiterate that it is the responsibility of those who must prepare the authorization orders for which they seek court approval to "approach their task with both the pertinent statute book before them and the desire for an exacting standard of precision." *State v. Luther,* 116 R.I. at 30, 351 A.2d at 595.

In light of the foregoing determination, it becomes unnecessary to consider the other issues raised by the defendant. The appeal of the defendant is sustained, the motion to suppress the evidence obtained from the wiretap is granted, the judgment of conviction is vacated, and the case is remanded to the Superior Court for proceedings consistent with this opinion.

WEISBERGER and MURRAY, JJ., did not participate.

---

8. It is interesting to note that in *United States v. Moore,* 513 F.2d 485, 497 (D.C.Cir.1975), upon which the state relies, the court also indicated that there can be no good-faith defense allowed for failure to comply with the directives of the federal wiretap statute.